**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ASSOCIATED WHOLESALE GROCERS, INC., | |
| Plaintiff, | |
| v. | Case No. 2:18-cv-02212 |
| BUMBLE BEE FOODS LLC, LION CAPITAL LLP, LION CAPITAL (AMERICAS) INC., BIG CATCH CAYMAN L.P., CHRISTOPHER D. LISCHEWSKI, STARKIST COMPANY, DONGWON INDUSTRIES CO. LTD., DEL MONTE CORPORATION, TRI-UNION SEAFOODS LLC d/b/a CHICKEN OF THE SEA INTERNATIONAL, INC., AND THAI UNION GROUP PCL, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## ORIGINAL COMPLAINT

Plaintiff Associated Wholesale Grocers, Inc., states and alleges the following against Defendants, upon knowledge with respect to its own acts and upon information and belief and investigation by counsel with respect to all other matters. The investigation includes but is not limited to a review of: (a) public statements by Defendants and their affiliates, agents, and employees, including statements in court proceedings and civil, government, and regulatory investigations involving Defendants; (b) regulatory filings by Defendants; (c) documents believed to be authentic copies of Defendants' business records obtained from public record sources; (d) government and industry publications; and (e) pleadings and other filings in related litigation against Defendants arising out of the illegal price-fixing conduct alleged herein. Plaintiff expects that discovery of documents and information within the custody and control of Defendants and/or produced in related litigation will

provide further evidence supporting its allegations.

## **INTRODUCTION**

1.      This antitrust action arises out of a long-running conspiracy between and among the three largest domestic producers of shelf-stable tuna (*e.g.*, canned or pouched tuna) ("canned tuna" or "shelf-stable tuna") to fix, raise, and/or maintain the prices of canned tuna in the United States.

2.      As shown below, Defendants facilitated the conspiracy by, among other things, secretly and collusively exchanging price information and business plans, coordinating price announcements, and collectively reducing quantity and restraining output.  These coordinated efforts by Defendants were designed to and did dramatically increase the prices of shelf-stable tuna.

3.      The conspiracy, which began no later than May of 2004 and continued through at least July of 2015 (the "Relevant Period"), directly impacted Plaintiff.  The conspiracy's effect on the price of shelf-stable tuna, on information and belief, continued up and through at least 2017.  Discovery is required to determine the full nature of the period, participants, and packaged seafood products involved.

4.      Defendants include the largest domestic producers and sellers of canned tuna – Bumble Bee Foods LLC, StarKist Company, and Tri-Union Seafoods LLC d/b/a Chicken of the Sea International, Inc. ("Tri-Union") – as well as the parent entities of those companies. Together, these Defendants produced upwards of 80% of all canned tuna sold in the United States during the Relevant Period.

5.      Although it had started at least by 2004, the price-fixing conspiracy remained hidden and was not uncovered until after Defendant Thai Union Group PCL, Tri-Union's parent

entity, announced its intent to acquire Defendant Bumble Bee for $1.5 billion in late 2014. The acquisition, had it been completed, would have created the largest canned tuna producer in the United States, with approximately 38% of the market share.

6. However, in connection with its review of the proposed acquisition, the Antitrust Division of the United States Department of Justice ("DOJ") determined that the market for canned tuna in the United States was not functioning competitively and, in fact, was subject to a price-fixing conspiracy involving Defendants. This prompted the DOJ to open a criminal investigation into the conspiracy alleged herein.

7. In December 2015, and as a direct result of the DOJ's investigation, Thai Union and Bumble Bee announced that the acquisition was being abandoned.

8. The DOJ's investigation is ongoing. To date, Defendant Bumble Bee, two Bumble Bee executives, and a StarKist executive all have pleaded guilty to charges related to the price-fixing conspiracy alleged herein.

9. In addition, in September 2017, Thai Union announced that Tri-Union has received "conditional leniency" under the DOJ's "Corporate Leniency Program" with respect to the DOJ's investigation into the price-fixing conspiracy alleged herein. A recipient of conditional leniency must *admit* to a criminal violation of the antitrust laws as a prerequisite to receiving conditional leniency.

10. Because of the conspiracy alleged herein, Plaintiff has paid supra-competitive prices for canned tuna and therefore has been injured by Defendants' illegal actions.

## JURISDICTION AND VENUE

11. This civil antitrust action arises under Sections 1 of the Sherman Act, 15 U.S.C. § 1 for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for treble

damages and permanent injunctive relief pursuant to the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.

12.     This Court has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. §§ 1331 and 1337.  This Court further has subject matter jurisdiction over each of the claims in this action pursuant to 28 U.S.C. § 1332, as, upon information and belief, this action is between citizens of different States and has an amount in controversy in excess of $75,000, exclusive of interest and costs.

13.     Venue is proper in this Court pursuant to 15 U.S.C. § 22, and 28 U.S.C. § 1391(b), (c) & (d), because:

(a)     a substantial part of the events giving rise to these claims occurred in this District, including the sales to Plaintiff of shelf-stable tuna at artificially high prices;

(b)     each Defendant is subject to personal jurisdiction in this District; and

(c)     Defendants transact business in this District.

14.     Defendants are subject to the personal jurisdiction of this Court because:

(a)      they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in the United States sufficient to satisfy due process;

(b)      they are amenable to service of process because each transacts business in, has continuous or systematic contacts with, or has sufficient minimum contacts in this District, and Defendants headquartered outside this District are nevertheless engaged in the business of manufacturing, distributing, advertising and/or selling shelf-stable tuna throughout the United States, including in this District;

(c)      they are amenable to service of process because each Defendant belonged

to the conspiracy alleged in this Complaint and one or more of them performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling shelf-stable tuna to Plaintiff and others in this District at artificially inflated prices;

(d)      they are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and/or the Kansas Long Arm Statute, K.S.A. 60-308, because each Defendant, either personally or through their co-conspirators in furtherance of the conspiracy, has sufficient minimum contacts with Kansas, including that each Defendant: transacted (and continues to transact) business in this state, committed tortious acts within Kansas; entered into contracts with a Kansas resident that were to be performed in whole or in part in Kansas; and caused injury in Kansas arising out of acts or omissions outside of Kansas while Defendants were engaged in solicitation or service activities within Kansas.  In addition, Defendants have submitted to the jurisdiction of the Court because of their continuous and systematic contacts with Kansas; and

(e)      they contracted to supply services or goods, including shelf-stable tuna, or have agents who contracted to supply materials or goods, including shelf-stable tuna, in this District; money flowed from Plaintiff in Kansas to pay Defendants for shelf-stable tuna; Defendants transact business in the District or have agents who transact business on their behalf in the District in furtherance of the conspiracy; Defendants committed unlawful acts or caused one or more unlawful acts to be done, or consequences to occur, in the District; and Defendants engaged in unlawful conduct described below outside of the District causing injury to Plaintiff in the District.

## DISCOVERY IS NECESSARY TO DETERMINE THE CONSPIRACY'S FULL SCOPE

15.     Discovery is necessary to determine the full scope of the conspiracy, including its length and the products and participants involved. Plaintiff reserves the right to amend or supplement this Complaint to add other defendants, claims, time periods, products, or other allegations based on discovery and further investigation. Specifically, upon information and belief, documents exist and have been produced in the multidistrict litigation involving the conspiracy alleged herein that will provide vastly more detail about the conspiracy and the allegations contained herein.

16.     Moreover, upon information and belief, documents exist that suggest coordination and possible coordination between certain Defendants regarding certain other packaged seafood products, including shelf-stable salmon, clams, mackerel, oysters, shrimp, and sardines, dating back at least to 2006.

## PLAINTIFF

17.     Plaintiff Associated Wholesale Grocers, Inc. ("AWG"), is a Kansas corporation with its headquarters and principal place of business in Wyandotte County, Kansas, at 5000 Kansas Avenue, Kansas City, Kansas, 66106.  Founded in 1924, AWG provides over 3,800 grocery stores and other retail outlets with a complete assortment of grocery, fresh meat, fresh produce, specialty foods, and general merchandise items.   From its Kansas corporate headquarters, AWG purchased canned tuna sold by one or more of the Defendants, their subsidiaries, divisions, units, or affiliates.  As a result, AWG has been injured by reason of the antitrust violations alleged herein.

18.     AWG is a direct purchaser of canned tuna.

19.     During the Relevant Period, AWG purchased canned tuna directly from Defendants, which it then re-sold to retailers.  AWG directly purchased many millions of dollars' worth of shelf-stable tuna products during the Relevant Period.

## DEFENDANTS

20.     The acts alleged herein that were done by each of the co-conspirators were fully authorized by each of those co-conspirators, or ordered or committed by duly authorized officers, managers, agents, employees or representatives of each co-conspirator while actively engaged in the management, direction, or control of its affairs.

### The Bumble Bee Defendants

21.     Defendant Bumble Bee Foods LLC is a Delaware limited liability company with headquarters located in San Diego, California.

22.     Bumble Bee is the second largest seller of canned tuna in the United States, and it is the largest seller of other shelf-stable seafood products.  During the Relevant Period, Bumble Bee manufactured and sold shelf-stable tuna, salmon, crabs, sardines, mackerel, oysters, and shrimp.

23.     Bumble Bee is owned by Defendant Lion Capital LLP, a private equity firm located in England.  During the Relevant Period, Lion Capital maintained offices in New York and Los Angeles.

24.     Lion Capital operates in the United States through Defendant Lion Capital (Americas), Inc. ("Lion Americas"), its subsidiary.  Upon information and belief, there is no meaningful distinction between Lion Capital and Lion Americas.  Indeed, Lion Capital and Lion Americas operate out of the same Los Angeles office; use the same website without distinguishing between the entities; and, upon information and belief, have and have had significant overlap in personnel during the time period Lion Capital has owned Bumble Bee.

Defendant Bumble Bee's Plea Agreement with the DOJ lists Lion Americas as one of its parent companies.

25.     Defendant Big Catch Cayman L.P., is a limited partnership established in 2010. According to SEC filings, Big Catch Cayman's mailing address is Lion America's New York office, located at 888 7th Avenue, 43rd Floor, New York, New York, 10019.

26.     Upon information and belief, Big Catch Cayman is a holding company that wholly owns Bumble Bee.  Bumble Bee's Plea Agreement with the DOJ lists Big Catch as one of its Parent Companies, and is described as the entity that would receive the proceeds from any sale of Bumble Bee.  As part of the Plea Agreement, Big Catch Cayman must pay to the United States a fine of up to $81.5 million in the event Bumble Bee is sold.  Upon information and belief, Big Catch Cayman is a mere shell company and does not engage in any operations separate from those of Bumble Bee.

27.     For purposes of this pleading, and unless otherwise specifically noted, "Lion Capital" shall refer to Lion Capital, Lion Americas, and Big Catch Cayman.

28.     Upon information and belief, during the Relevant Period, Lion Capital was aware of the conspiracy, directly participated in the conspiracy, and knowingly accepted the proceeds of the conspiracy.  In the alternative, upon information and belief, during the Relevant Period, Lion Capital participated in the conspiracy by and through Bumble Bee, which acted as and was Lion Capital's alter ego or agent.

29.     Lion Capital purchased Bumble Bee in 2010 for $980 million.  In 2014, just four years later, Lion Capital agreed to sell Bumble Bee to Defendant Thai Union Group for approximately $1.5 billion.  Had the sale gone through, the acquisition would have combined the

second and third largest sellers of canned tuna in the United States, in a market long dominated by Defendants.

30.     However, in December 2015, Bumble Bee and Thai Union announced that they were abandoning their plans to merge after the DOJ informed the companies that it had "serious concerns" that the proposed transaction would harm competition.   Notably, then-Assistant Attorney General Bill Baer of the DOJ's Antitrust Division said, "Our investigation convinced us – and **the parties knew or should have known from the get go** – that **the market is not functioning competitively today, and further consolidation would only make things worse.**"

31.     Thus, according to sophisticated investigators with access to Bumble Bee's confidential documents, Bumble Bee and Lion Capital knew or should have known about the price-fixing conspiracy alleged herein during the Relevant Period.

32.     Lion Capital's direct involvement is further demonstrated by its website, which shows it to be a firm that closely manages the business affairs of the companies in which it invests.   The website states that Lion Capital "ensure[s] that our companies have the best management talent to execute the vision that we develop in a collaborative partnership," and the "the responsibility for successful outcomes in our companies rests with us."   Moreover, in a video interview on the website, Lyndon Lea, Lion Capital's founder, states:   "If all they [potential acquisitions] want is a check, there are plenty of private equity firms that are delighted to write you a check and let you get on with your business.   That's not us."   Lea continues: "What we're good at doing is being your **partner**."   Another video on Lion Capital's website states that:   "We [Lion Capital] built a team with an intimate knowledge of the way consumers and brands interact, allowing us to work with companies in a very different way to the average private equity firm….We work closely with management to see exactly what a brand is capable

of achieving, and then take it to new heights….We focus solely on retail and consumer businesses so our team is uniquely positioned to work with management to identify the right strategies for revitalizing operations."

33.     Thus, Lion Capital's own statements show that it directly participates in the operations and business decisions of its companies, including Bumble Bee.

34.     In addition, upon information and belief, Bumble Bee is undercapitalized, which alone is a legal basis to hold Lion Capital vicariously liable for Bumble Bee's unlawful conduct. As part of its guilty plea, Bumble Bee agreed to pay an initial fine of $25 million.  This fine is far below the DOJ's guideline fine range of $113.5 million. According to the DOJ's Sentencing Memorandum, the downward departure was justified both because Bumble Bee has provided and will continue to provide substantial assistance and cooperation to the DOJ in its ongoing investigation into the conspiracy alleged herein and because any higher fine would have "substantially jeopardize[ed] the continued viability of the organization."

35.     Upon information and belief, Lion Capital undercapitalized Bumble Bee at the time of the acquisition and kept Bumble Bee undercapitalized thereafter.

36.     Defendant Christopher Lischewski is and has been Bumble Bee's CEO and President during the entirety of the Relevant Period.  He is a resident of San Diego County, California.  Plaintiffs sue Lischewski in both his individual and official capacity for his participation in the conspiracy between at least 2004 and 2015.

37.     Upon information and belief, Lischewski, Bumble Bee's CEO since 1999, ensured that customers paid more for canned tuna by personally directing and engaging in the illegal price-fixing conspiracy alleged herein.

38.     On numerous occasions, Lischewski has publicly encouraged Defendants to maintain the illegal conspiracy alleged herein.  For example, at an Infofish industry conference in late May 2008, Defendant Lischewski gave a keynote address in which he urged fellow "global industry leaders" to undertake the challenge to drive the development of "sustainable tuna management practices."  Thereafter, beginning in or about August of 2008, Defendants all collusively shrunk the size of their cans of tuna from 6 oz. to 5 oz.

39.     In 2011, Defendant Lischewski complained that tuna was "too cheap" and that it was "important to persuade customers to pay more for canned tuna."

40.     Upon information and belief, Defendant Lischewski played an active role in helping Lion Capital to undercapitalize Bumble Bee and reaped substantial personal profits from the price-fixing conspiracy alleged herein.

41.     Bumble Bee's annual revenue exceeds $1 billion dollars.

### The Tri-Union Defendants

42.     Defendant Tri-Union Seafoods LLC, doing business as Chicken of the Sea, is a California limited liability company with headquarters located in San Diego, California.

43.     Tri-Union is the third-largest seller of canned tuna in the United States, and it is the second largest seller of other shelf-stable seafood products.  During the Relevant Period, Tri-Union manufactured and sold shelf-stable tuna, salmon, sardines, clams, shrimp, mackerel, and oysters.

44.     Tri-Union is a wholly-owned subsidiary of Defendant Thai Union Group PCL f/k/a Thai Union Frozen Products PCL.  Thai Union Group is a corporation organized, existing, and doing business in Thailand, with headquarters located in Thailand.

45.     Upon information and belief, during the Relevant Period, Thai Union, through Tri-Union, directly participated in the conspiracy, purposefully directed the conspiracy at the

United States, produced and sold canned tuna throughout the United States, exported canned tuna to the United States from Thailand and elsewhere, used its dominance or control of Tri-Union's raw material purchasing and tuna business to conspire with the other Defendants, and engaged in the unlawful conduct alleged herein in violation of state and federal law.

46.     Alternatively, upon information and belief, during the Relevant Period to Plaintiff's claims, Thai Union participated in the conspiracy by and through Tri-Union, which acted as and was Thai Union's alter ego or agent.  Thai Union dominated or controlled Tri-Union's canned tuna business as reflected by, among other things, Thai Union's domination or control of Tri-Union's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna.  During this time period, Thai Union effectively controlled and took over performance of the day-to-day operations of Tri-Union's canned tuna business, and there was such unity of interest and ownership between Thai Union and Tri-Union that the individuality or separateness of the two companies ceased with respect to Tri-Union's canned tuna business.  Tri-Union's status as the alter ego or agent of Thai Union is evidenced by the following:

(a)     Thai Union used Tri-Union as a mere shell, instrumentality, and/or conduit for a single venture involving the sale of price-fixed canned tuna in the United States that had been caught, processed, and packaged by Thai Union in Thailand for the benefit of Thai Union.  Tri-Union allowed Thai Union to be vertically integrated with respect to its U.S. operations.  As a result of this structure, Thai Union and Tri-Union functioned as a single entity for purposes of the conspiracy.  Indeed, with respect to the canned tuna produced by Thai Union in Thailand and sold in the United States, Tri-Union acted merely as Thai Union's marketing arm to sell Thai Union's canned tuna under Tri-Union's own "Chicken of the Sea" brand.  This is not surprising,

as Thai Union views Tri-Union as part of Thai Union's "Global Tuna Business" that is controlled directly by Thai Union's Board of Directors and executives:



(b)     Thai Union dominated or controlled Tri-Union's marketing of canned tuna in the United States.  For example, Thai Union presents a common global marketing image with Tri-Union's Chicken of the Sea brand.  Thai Union's 2016 Annual Report lists Chicken of the Sea among its "vast selection of shelf-stable, chilled and frozen foods" and notes that in 2015, "Chicken of the Sea was the largest U.S. seafood company by revenue, and the top importer of frozen shrimp and pasteurized crabmeat in the U.S."

(c)     Thai Union and Tri-Union use the same offices or locations in the United States.  In identifying its "footprint," Thai Union's 2016 Annual Report lists corporate offices in Portsmouth, New Hampshire; New York, New York; El Segundo, California; San Diego, California; and Lyons, Georgia.  Each of these offices is an office or plant of Tri-Union.

(d)     Thai Union and Tri-Union have had and currently have numerous overlapping board members and executives.  Tri-Union's Board of Directors includes many high-level Thai Union executives, including:   Thiraphong Chansiri (President and Chief Executive Officer, Thai Union); Kraisorn Chansiri (Chairman, Thai Union); and Cheng Niruttinanon (Executive Chairman, Thai Union).  Chan Tin Kang, an Executive Director and current Chief Financial Officer of Thai Union, was formerly a Tri-Union Director.  Moreover, Tri-Union's President and CEO from 2007 to 2016, Shue Wing Chan, is a member of the Thai Union-controlling Chansiri family and is part of Thai Union's "Global Leadership Team." Before joining Tri-Union, Chan was CFO of Thai Union.  David Roszmann, Chief Operating Officer of Tri-Union from March 2013 to December 2015, states on his LinkedIn page that his "only direct report [was] to CEO (relative of majority owning family of this foreign public company)…."

(e)     Due to the unlawful conduct alleged herein, Tri-Union earned profits in excess of what it would have earned in a competitive market.  Tri-Union transferred these ill-gotten gains to its parent, Thai Union, by paying out the unlawfully obtained profits and other conspiracy proceeds to Thai Union in the form of dividends and other transfer payments. Accordingly, Thai Union knowingly profited from Tri-Union's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched.  Further, upon information and belief, Thai Union charged Tri-Union prices for tuna that were higher than Tri-Union would have paid had Tri-Union been free to acquire tuna at market rates.  As a result, adherence to the fiction of the separate existence of Thai Union and Tri-Union would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over the substance of the relationship.

47.     Upon information and belief, Thai Union held weekly "interdepartmental meetings" where it closely managed Tri-Union's business.  Shue Wing Chan, Tri-Union's former President and CEO, frequently participated in these meetings via conference call.  Despite being nominally based in the United States, Tri-Union's board met in Thailand.  Thai Union management regularly attended Tri-Union board meetings as a means of asserting control and domination over the day-to-day operations of Tri-Union and reviewed executive summaries of Tri-Union's business.  Thai Union executives also regularly attended the meetings of the "Managers of Tri-Union Seafoods, LLC" in San Diego.  The meeting participants discussed matters like price increases, costs, and marketing.

**The StarKist Defendants**

48.     Defendant StarKist Company is a Pennsylvania corporation with headquarters located in Pittsburgh, Pennsylvania.

49.     StarKist is the largest seller of shelf-stable tuna in the United States.  During the Relevant Period, StarKist manufactured and sold shelf-stable tuna and salmon.

50.     Upon information and belief, StarKist's annual revenue exceeds $1 billion.

51.     StarKist is a wholly-owned subsidiary of Defendant Dongwon Industries Co. Ltd. ("Dongwon").  Dongwon is a corporation organized, existing, and doing business in South Korea with headquarters in South Korea.

52.     Upon information and belief, Dongwon directly participated in the unlawful conduct alleged herein, or used its dominance or control over StarKist to conspire with other Defendants in violation of state and federal law.

53.     Dongwon is a form of business organization known in South Korea as a "chaebol."  Broadly speaking, chaebols are closely-knit business groups under the control of a

single family or extended family, with key flagship firms that are used as the instruments of control of other firms within the group.

54.    The Dongwon family of companies fits this definition. The company started in 1969 and is dominated by Chairman Jae-chul Kim ("Chairman Kim") and members of his family or extended family.   The group headquarters is in Seoul, South Korea, where its holding company, Dongwon Enterprises, is located.   Through its subsidiaries, Dongwon Enterprises operates in a number of business sectors including marine products, other food products, feed products and pet food, packing materials, and aluminum foil products.  As explained below, the Dongwon family of companies has an internal culture of hierarchy, familism and loyalty. Defendants Dongwon and StarKist exhibit that culture with members of Chairman Kim's family being put in key positions in both companies.  Moreover, executives at Dongwon, Dongwon Enterprises, and various other Dongwon subsidiaries are routinely seconded to StarKist to fill managerial roles.  Dongwon, run by Chairman Kim, is the parent entity for StarKist, but his control over the Dongwon family of companies was and is such that, upon information and belief, he could (and in fact did) command executives of the holding company or from sister subsidiary companies to either oversee the business of StarKist from Korea or relocate to the United States to help run StarKist.  This was done without regard for which Dongwon subsidiary the individual worked for, and during their involvement in StarKist's management, all Dongwon personnel were functionally Dongwon Industries personnel subject to the direct control of Chairman Kim.  In other words, as a chaebol, Dongwon does not follow the principles of corporate separateness that are expected of companies incorporated in the United States and instead acts as a single integrated enterprise. Accordingly, acts taken by employees of Dongwon's corporate affiliates in furtherance of the conspiracy, as alleged in detail below, were

taken on behalf of the interests of the chaebol and under the control of Dongwon (and Chairman Kim) as the chaebol's flagship.

55.     Upon information and belief, during the Relevant Period, Dongwon, through StarKist, directly participated in the conspiracy and purposefully directed this conduct at the United States, produced and sold canned tuna throughout the United States, used its dominance or control of StarKist's raw material purchasing and tuna business to conspire with the other Defendants, and engaged in the unlawful conduct alleged herein in violation of state and federal law.

56.     Alternatively, upon information and belief, during the Relevant Period Plaintiff's claims, Dongwon participated in the conspiracy by and through StarKist, which acted as and was Dongwon's alter ego or agent.   Dongwon dominated or controlled StarKist's canned tuna business as reflected by, among other things, Dongwon's domination or control of StarKists's production, pricing, hiring, budgeting, capitalization and/or marketing of canned tuna.   During this time period, Dongwon effectively controlled and took over performance of the day-to-day operations of StarKist's canned tuna business, and there was such unity of interest and ownership between Dongwon and StarKist that the individuality or separateness of the two companies ceased with respect to StarKist's canned tuna business.   StarKist's status as the alter ego or agent of Dongwon is evidenced by the following:

(a)     Dongwon used StarKist as a mere shell, instrumentality, or conduit for a single venture involving the sale in the United States of price-fixed canned tuna caught, processed, and/or packaged by Dongwon in South Korea and Thailand for the ultimate benefit of Dongwon and the Kim family.   Dongwon used StarKist to market Dongwon's product.   StarKist enabled Dongwon to be vertically integrated with respect to its U.S. operations.   As a result of

this vertical integration, Dongwon and StarKist effectively functioned as a single entity for purposes of the conspiracy.  With respect to the canned tuna produced by Dongwon in South Korea and Thailand and sold in the United States, StarKist merely acted as Dongwon's marketing conduit to sell Dongwon's canned tuna under the Dongwon-owned StarKist label.

(b)    Dongwon dominated or controlled StarKist's marketing of canned tuna in the United States.  Dongwon's website states:

> StarKist is the world's best tuna brand with 65 years of history, and holds the No. 1 position in the US tuna market.  Like Dongwon Group in Korea, StarKist is an iconic tuna brand in the United States, and **has been controlled by Dongwon Group since 2008**, accompanying Dongwon Group on its journey to globalization.  Dongwon Group, which has already become the dominant player in Korea's tuna market, has focused on the steady growth of the world's tuna market and determined that tuna can be one of core resources that will lead future industries.  **Through the acquisition of StarKist, Dongwon Group has secured an opportunity to take off as the world's biggest tuna company, and will become de facto a globalized enterprise.**

(c)    Dongwon has presented a common global marketing image with StarKist. After acquiring StarKist in 2008, Dongwon stated: "We believe this acquisition will help Dongwon establish a strong foothold in penetrating the U.S. market," and the purpose of the acquisition was "to add a stable buyer of its tuna and to place other products in the U.S. through StarKist's distribution network."   Dongwon and StarKist present themselves as a single, vertically integrated entity.  StarKist's website states that "Dongwon Industries is one of the world's largest tuna catching companies with a fleet of 36 boats. Dongwon's world class fish procurement and processing capacity builds on StarKist's national brand recognition and distribution networks in the United States to bring world-class seafood to consumers worldwide."

(d)     Dongwon and StarKist use and used the same offices or locations in the United States.  Dongwon and StarKist had overlapping Board Members and key executives who dominated or controlled StarKist.  For example, in or about September 2014, Andrew Choe ("Choe") became the President and CEO of StarKist.  Choe first arrived at StarKist in April 2012 as the Senior Vice-President of its supply chain and operations.  Previously, Choe had held an executive position at Dongwon as Director of Strategic Planning.  Nam-Jung Kim ("NJ Kim"), son of Chairman Kim, served as the COO of StarKist from about 2012 until October 2014, when he was promoted to Vice Chairman of StarKist.  He currently serves on the board of directors for StarKist and Dongwon.  Prior to his being sent to join StarKist, NJ Kim was Vice-President of Dongwon F&B (a Dongwon subsidiary) and Dongwon Enterprises, the family's holding company.  Since 2008, NJ Kim has served as the Head of the Finance and Planning Department at Dongwon Systems and served as Vice President of its construction unit.  Additionally, according to Forbes, in preparation for Chairman Kim's succession, "the founder has been transferring ownership of the private family holding company, Dongwon Enterprise Co., which owns stakes in [Dongwon and other affiliates], to [NJ Kim]. [Chairman Kim] holds a 24.5% stake and [NJ Kim], 68%."  Accordingly, NJ Kim owned a controlling interest in Dongwon while serving as StarKist's COO and Vice Chairman.  The position of COO was created specifically for him, so that he could lead the "continued growth and expansion of Dongwon-StarKist's global business."  Also, Hyung-Joo Kim, Chief Financial Officer of Dongwon F&B, was seconded to StarKist in 2012 to serve as CFO.  In-Gu Park ("IG Park"), the Chairman of the Board of StarKist, also served as its Acting President from November 2010 to March 2011.  IG Park serves as CEO of Dongwon Precision Machinery Company, and has also served as CEO and Vice Chairman at Dongwon F&B and Dongwon Enterprises. During the Relevant Period, IG

Park chaired StarKist's board of directors while simultaneously sitting on the board or serving as an officer (or both) of other Dongwon companies. Additionally, StarKist's board meetings were often held in South Korea so that Dongwon executives could easily attend them.

(e)     Dongwon appointed people who were involved in the day-to-day operations of StarKist, including people who participated in the conspiracy as Dongwon intended. For instance, and without limitation, Dongwon appointed senior executives at StarKist – including at least In-Soo Cho ("IS Cho"), Choe, and Sam Lee. Additionally, Dongwon dismissed several StarKist executives in 2012 and replaced them with employees from within the Dongwon corporate family, including Hyung-Joo Kim as CFO. After Dongwon's acquisition of StarKist, American executives at StarKist began to leave, both voluntarily and involuntarily.

(f)     Due to the unlawful conduct alleged in herein, StarKist earned profits in excess of what it would have earned in a competitive market. Accordingly, Dongwon knowingly profited from StarKist's participation in the conspiracy and knowingly accepted the proceeds of the conspiracy and has been unjustly enriched. As a result, adherence to the fiction of the separate existence of Dongwon and StarKist would sanction a fraud or promote an injustice, and an inequitable result or an injustice would occur if the corporate form were elevated over substance.

57.     Dongwon purchased StarKist from Defendant Del Monte Corporation in October of 2008 for approximately $363 million. Del Monte, now known as Big Heart Pet Brands, Inc., is a Delaware corporation with headquarters in Orrville, Ohio. Although the sale occurred in 2008, Del Monte continued to operate StarKist on Dongwon's behalf until around September of 2010 under an "Operating Services Agreement" between Dongwon and Del Monte. Under that agreement, Del Monte provided the sales staff that sold StarKist products in the United States

and also provided operational services, such as "warehousing, distribution, transportation, sales, IT and administration."

58. Del Monte participated directly in various acts in furtherance of the conspiracy alleged herein.

59. Del Monte purchased StarKist in December 2002. It owned and managed StarKist until the sale to Dongwon in October 2008. From the period before October 2010, references to StarKist include Del Monte.

## TRADE AND COMMERCE

60. During the Relevant Period, Defendants engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial. In particular:

(a) Defendants sold and shipped substantial quantities of shelf-stable tuna in a continuous and uninterrupted flow in interstate commerce to customers located in states other than the states in which the Defendants produced shelf-stable tuna;

(b) data, information, correspondence and/or financial material were exchanged between each Defendant in the state in which each is located, incorporated, or has its principal place of business and other states; and

(c) money flowed between banks outside of the state in which each Defendant is located, incorporated, or has its principal place of business and other states.

61. The effect of Defendants' and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## THE SHELF-STABLE TUNA MARKET IN THE UNITED STATES

62. Shelf-stable or canned tuna is composed of raw tuna that has been processed to preserve the tuna and provide a lengthy shelf life.

63.     The United States packaged seafood industry generates annual sales in excess of $2.5 billion.  Of that total, tuna accounts for approximately $1.7 billion of annual packaged seafood sales.  The remaining products are other types of packaged seafood, such as salmon, clams, shrimp, sardines, mackerel, and oysters.

### The Production of Shelf-Stable Tuna

64.     The production of shelf-stable tuna begins with catching fish.  Tuna generally is caught by fishing vessels operating in the Pacific, Atlantic, or Indian Oceans, with the majority of tuna caught in the Pacific.  After it is caught, the tuna is frozen or refrigerated for transport. Both Dongwon and Thai Union control extensive fleets of fishing vessels that are used at least in part to supply tuna to StarKist and Tri-Union, respectively.

65.     The frozen or refrigerated tuna is delivered to a processing plant, where it is then thawed and transferred to large steam ovens for "precooking."  The tuna is baked for a prescribed time at a prescribed temperature, depending on the size of the fish.  The fish is then cooled and sent for cleaning, which involves separating the meat from the skin and bones.

66.     Once cleaned, the tuna is fed into filling machines for packaging.  Shelf-stable tuna is packaged into both cans and pouches or "kits." Seasoning or packing liquid can be added before the packages are sealed.

### The Domestic Canned Tuna Market was Highly Susceptible to Collusion in the Relevant Period

67.     Over the past two decades, the canned tuna industry has undergone a high degree of consolidation.  As a result of this consolidation, and for the full extent of the Relevant Period, the market for the production of shelf-stable tuna in the United States has become highly concentrated.

22

68.     During the entirety of the Relevant Period, the market for the production of canned tuna was dominated by Defendants.  But for the conspiracy alleged herein, Defendants would have had to compete on price.  Although market share estimates vary to some degree, in December 2014, the Wall Street Journal reported that the Defendants' respective shares of the domestic market for canned tuna were:  StarKist (36%); Bumble Bee (28%); and Chicken of the Sea (20%).  Together, their combined market share during the Relevant Period approached and exceeded 80%.

69.     The limited number of Defendants and their high collective market share made the shelf-stable tuna market in the United States highly susceptible to collusion.  Defendants were together able to exercise their market power to fix, maintain, and raise prices of shelf-stable tuna in the United States.

70.     The market for the manufacture of shelf-stable tuna is mature and, but for the conspiracy alleged herein, producers compete primarily on price.

71.     The highly-concentrated, oligopolistic structure of the canned tuna industry in the United States is reinforced by significant barriers to entry.

72.     New entrants face substantial start-up costs, including the need to acquire a supply of tuna loins (through fishing or other means) and gain access to distribution channels and retail outlets.

73.     In addition, new entrants face substantial costs to build a plant to process tuna loins into canned tuna.  For example, a company called Tri-Marine International, Inc., invested approximately $70 million to modernize its plant in Pago Pago, American Samoa between 2010 and 2015.  The $70 million cost just to modernize an existing plan is significant evidence that the purchase and construction of a new canned tuna plant would cost far in excess of $70 million.

74.     These start-up costs reduced the opportunity or ability for rivals to enter the market and undercut Defendants' conspiratorial pricing.

75.     Furthermore, the existence of restrictive tariffs ranging from 6-35% on imported shelf-stable tuna products into the United States impaired the ability of foreign suppliers to take advantage of the supra-competitive prices imposed on the United States marketplace by Defendants' unlawful agreement.

76.     Canned tuna is essentially a commodity product.  The United States Department of Labor has referred to canned tuna as a "relatively undifferentiated commodity…with widespread consumer indifference to its country of origin or brand name."  A product that is highly fungible like a commodity is highly susceptible to agreements to fix prices.

### Supply and Demand of Shelf-Stable Tuna in the United States

77.     Technological advances in fishing for tuna over the last 40 years – most notably the rise of "purse seine" fishing – have greatly altered the commercial fishing industry.  "Purse seine" is a fishing method that uses large nets to engulf and capture entire schools of fish.  Purse seining has increased the efficiency of fishing and substantially lowered the cost necessary to fish for tuna on a commercial scale.  According to the Pacific Island Forum Fisheries Agency, between 1986 and 2007, the average catch per tuna fishing vessel roughly doubled from 3,750 metric tons to 7,100 metric tons per year.  This, in turn, has spurred substantial recent investment in fishing vessels.  Between approximately 2007 and 2011, the number of tuna fishing vessels increased by more than 25%.

78.     Taken together, the increased number of vessels and their increased productivity has greatly increased the amount of skipjack tuna caught annually, as the chart below illustrates:



79.   Skipjack tuna makes up the majority of "light" grade tuna, which in turn makes up the majority of tuna used in prepackaged tuna products.  (Albacore is typically labeled "white tuna" when canned for sale in the United States.)

80.   At the same time the supply of tuna has been increasing, the demand for shelf-stable tuna products in the United States has been decreasing.  Indeed, there has been a decline in both the demand for and the consumption of canned tuna products. According to data from the National Oceanic and Atmospheric Administration, per capita canned tuna consumption in the United States dropped from 3.1 lbs. in 2005 to 2.3 lbs. in 2013.  Since 1999, canned seafood sales have fallen by nearly 30 percent.

81.   Demand for canned tuna products has declined in other countries as well.

82.   In competitive economic markets that are functioning properly, it is ordinarily the case that increases in supply and decreases in demand will result in lower prices.  As further alleged below, however, that has not been the case in the market for shelf-stable tuna – a direct result of the antitrust conspiracy alleged herein.

**Prices for Canned Tuna Have Increased in the Relevant Period**

83.     Due to the increasing supply of tuna for packaged seafood products and the decreasing demand for shelf-stable tuna products, market forces imposed substantial downward pressure on the price of shelf-stable tuna sold to Plaintiff and others in the United States during the Relevant Period.

84.     However, contrary to the bedrock economic forces of supply and demand, the price of canned tuna increased dramatically during the Relevant Period, with significant increases beginning in 2011.

85.     For example, Plaintiff paid a higher cost for the same or similar canned tuna products that it purchased from Defendants in 2014 than it did in 2011.

86.     The inconsistency between increasing catch levels and decreasing demand accompanied by price increases is represented graphically in the chart below, which shows that while consumption declined, the dollar amount spent on the canned seafood in fact increased:



87.     Defendants' pricing of shelf-stable tuna products sold to Plaintiff is not consistent with expected pricing of a commodity product for which there is increasing supply and declining demand in the United States.  Economic forces occurring during the conspiracy would lead one to expect and predict declining prices.  The increases in prices paid for canned tuna products were a direct result of the conspiracy.

88.     Price increases during the Relevant Period are not explained by raw material costs, as the cost of tuna at the dock has been decreasing.  According to the April 19, 2015, issue of Tuna Market Intelligence, "[a]s recently as June last year, skipjack was selling at US $1,800 in Bangkok. But the price has since plummeted to US $1,000 since the beginning of the year, with industry official anticipating further reduction in price this year."

89.     In its May 2015 Food Outlook biannual report, the United Nations Food & Agriculture Organization noted that "[p]rices of both skipjack and yellowfin have declined due to limited demand from canneries…."

90.     The chart below illustrates this steep price decline:



91.     The declining cost of tuna was not reflected in the price at which Defendants sold shelf-stable tuna products to Plaintiff.  In a functioning, competitive market, as input prices decline, price competition typically would produce lower prices.

92.     The supra-competitive prices of canned tuna products resulted in profits of substantial size for all Defendants.

93.     Defendant Thai Union, in its 2013 annual report, released February 24th, 2014, stated that its increased profits were due to "more rational market competition."  Thai Union repeated this statement in its next annual report for the year of 2014: "Thanks to reduced price competition (absence of cut throat pricing) and generally lower fish cost, our own tuna brands marked a great year of increased profitability.  Despite minimal sales growth in the US, competitive inventory cost and reasonable market conditions helped lift the margin of our US brand."

94.     Defendant Bumble Bee has reaped similar profits from the conspiracy.  As noted above, Lion Capital reached an agreement to sell Bumble Bee to Thai Union in 2014 for $1.5 billion, over $500 million more than it had paid to purchase the company just four years earlier. As part of the announcement of the sale, Lion stated that Bumble Bee had revenue of $1 billion and a company-record EBITDA of $150 million.

95.     StarKist, which possesses the largest share of the U.S. canned tuna market, has been similarly profitable, and stands to gain from supra-competitive levels of pricing as much as or more than the other Defendants.

96.     The market for production and sale of shelf-stable tuna products in the United States was concentrated in three firms during the conspiracy:  Bumble Bee, Tri-Union, and StarKist.  On their own, none of these companies had the unilateral power to control the supply

or price of canned tuna sold in the United States.  Indeed, any increase in price by one company that was not coordinated with similar increases by their competitors would lead almost immediately to lost sales and market share by the company that unilaterally increased price. Similar economic factors and considerations existed for any unilateral reduction in production. During the Relevant Period, Defendants' actions on pricing of shelf-stable tuna products would have been against their self-interest, and therefore irrational, absent collusion.

### The DOJ's Criminal Investigation

97.     A criminal antitrust investigation into Defendants' price-fixing conspiracy appears to have begun in July 2015, following Thai Union's announcement of its intention to acquire Bumble Bee for $1.5 billion.

98.     On December 3, 2015, Thai Union and Bumble Bee notified the DOJ that the proposed acquisition was being abandoned.  The decision to cancel the transaction was due directly to the DOJ's antitrust investigation and the companies' potential liability for anticompetitive behavior.

99.     The DOJ's criminal investigation of Defendants has resulted in guilty pleas for violations of federal antitrust laws. At the date of filing, the following high-placed sales executives involved in canned tuna pricing have pleaded guilty to criminal violations of 15 U.S.C. § 1:

(a)     Walter Scott Cameron, Senior Vice President of Sales for Bumble Bee (pleaded guilty on November 7, 2016);

(b)     Kenneth Worsham, Senior Vice President of Trade Marketing for Bumble Bee (pleaded guilty on December 21, 2016); and

(c)     Stephen L. Hodge, Senior Vice President of Sales for StarKist (pleaded guilty on June 8, 2017).

100.    The criminal Informations for all three executives state that beginning as early 2011 and continuing until or about 2013, the individuals and their coconspirators "knowingly entered into and engaged in a combination and conspiracy to fix, raise, and maintain the prices of packaged seafood sold in the United States."

101.    The Informations state that the exact dates of the conspiracy remain "unknown" to the DOJ.  They further provide that each defendant's conduct was an unreasonable restraint of interstate commerce in violation of Section 1 of the Sherman Act, and specify that the "substantial terms" of the unlawful conduct "were to fix, raise, and maintain prices of packaged seafood."  The Informations further specify that "[p]ackaged seafood includes shelf-stable tuna."

102.    The Informations for all three executives further state that the "means and methods" of the conspiracy included (a) engaging in conversations and discussions and attending meetings with representatives of "other major packaged-seafood-producing firms," (b) agreeing and reaching "mutual understandings" during these conversations, discussions and meetings to fix, raise and maintain the prices of packaged seafood sold in the United States, and (c) "negotiat[ing] prices and issu[ing] price announcements for packaged seafood in accordance with the agreements and mutual understandings reached."

103.    The Informations note, however, that "various business organizations" not made defendants in the Informations "participated as coconspirators in the offense charged in this Information."

104.    In ¶ 4(b) of each of Mr. Cameron's, Mr. Worsham's, and Mr. Hodge's Plea Agreements, each admits that:

During the relevant period, the defendant participated in a conspiracy with other persons and entities engaged in the manufacture and sale of packaged seafood, the primary purpose of which was to fix, raise, and maintain the prices of packaged seafood sold in the United States.  In furtherance of the conspiracy, the defendant engaged in conversations and discussions and attended meetings with representatives of other major packaged-seafood-producing firms. During these conversations, discussions, and meetings, agreements and mutual understandings were reached to fix, raise, and maintain the prices of packaged seafood sold in the United States.

105.   The maximum penalties for each of the executives' crimes include imprisonment for 10 years and fines of up to the greater of $1 million or twice the gross pecuniary gain to the conspirators, or loss caused to the victims, derived from the illegal price-fixing conspiracy.

106.   However, the Plea Agreements for all three executives recommend a significant downward departure from those maximums.  The Plea Agreement for Walter Scott Cameron recommends a reduced penalty "because of the defendant's substantial assistance in the government's investigation and prosecutions of violations of federal criminal law in the packaged-seafood industry."  It specifically recommends a greatly reduced prison term and a $25,000 fine.

107.   Worsham's and Hodge's Plea Agreements recommend downward departures based on their agreement to "cooperate fully and truthfully with the United States in the prosecution of this case, the current federal investigation of violations of federal antitrust and related criminal laws involving the production or sale of packaged seafood in the United States," and other related investigations. As with Cameron's, those Plea Agreements recommend a reduced prison term and a $25,000 fine.

108.   Worsham will be sentenced on September 28, 2018.  Upon information and belief, Cameron and Hodge do not yet have Sentencing Hearings scheduled.

109.   On May 8, 2017, the DOJ announced that Bumble Bee itself had agreed to plead guilty to price-fixing shelf-stable tuna products in the United States between 2011 and 2013.

110.   In addition to agreeing to plead guilty, Bumble Bee agreed to pay a criminal fine of $25 million for its criminal conduct. The fine will increase to a maximum of $81.5 million, to be paid by Defendant Big Catch Cayman, if Bumble Bee is sold.

111.   Both fines are below the DOJ's guideline fine range of $113.5 million. According to the DOJ's Sentencing Memorandum, the downward departure was justified both because Bumble Bee has provided and will continue to provide substantial assistance and cooperation to the DOJ in its ongoing investigation into the conspiracy and because any higher fine would have "substantially jeopardize[ed] the continued viability of the organization." Indeed, the Sentencing Memorandum explicitly noted the ongoing related multidistrict litigation pending before The Honorable Janis Sammartino, United States District Judge for the Southern District of California, stating that "a fine reduction is required to the extent a guidelines fine would impair the defendant's ability to make restitution to victims in the civil lawsuits."

112.   The Honorable Edward M. Chen, United States District Judge for the Northern District of California, accepted Bumble Bee's guilty plea and entered judgment against it under the terms recommended by the DOJ on August 7, 2017.

113.   Bumble Bee's cooperation will very likely provide additional evidence in support of the allegations in this Complaint, evidence that will be uncovered through the course of discovery.

114.   On September 11, 2017, in a letter to The Stock Exchange of Thailand, Thai-Union announced that Tri-Union has received "conditional leniency" under the DOJ's "Corporate Leniency Program" with respect to the DOJ's investigation into the price-fixing

conspiracy alleged herein.  The letter states:  "Provided Tri-Union continues to fully cooperate with the DOJ, Tri-Union's conditional leniency status means that neither Tri-Union nor any cooperating executives or employees within the scope of the [conspiracy alleged herein] will face criminal fines, jail time or prosecution."

115.    First implemented in 1978, the DOJ's Corporate Leniency Program "allows corporations…involved in antitrust crimes to self-report and avoid criminal convictions and resulting fines and incarceration," provided that the corporation is the first corporate conspirator to confess, it fully cooperates with the DOJ's investigation, and meets certain other conditions.

116.    The Corporate Leniency Program includes two types of leniency:  Type A and Type B.  Type A Leniency is available only before the DOJ has received any information about the alleged illegal conduct, while Type B Leniency is available when the DOJ uncovers wrongdoing and then uses a company's cooperation to build its case.  Because the DOJ first uncovered evidence of the conspiracy alleged herein as part of its review of the Tri-Union and Bumble Bee consolidation, it is likely that Tri-Union is proceeding under Type B Leniency.

117.    In order to qualify for Type B Leniency, a company must, among other things, be "the first one to come forward and qualify for leniency with respect to the illegal activity being reported," "report[] the wrongdoing with candor and completeness[,] and provide[] full, continuing and complete cooperation that advances the [DOJ] in its investigation."  In addition, a company may qualify for leniency only if the "confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials."

118.    Critically, an applicant for leniency must *admit* to a criminal violation of the antitrust laws *before* receiving a conditional leniency letter.  "Applicants that have not engaged

in criminal violations of the antitrust laws have no need to receive leniency protection from a criminal violation and will not qualify for leniency through the Leniency Program."

119.   The DOJ "may also insist on interviews with key executives of the applicant who were involved in the violation before issuing the conditional leniency letter. A company that argues that an agreement to fix prices, rig bids, restrict capacity, or allocate markets might be inferred from its conduct but that cannot produce any employees who will admit that the company entered into such an agreement generally has no made a sufficient admission of a criminal antitrust violation to be eligible for leniency."

120.   Thus, Thai Union's public announcement that Tri-Union has received "conditional leniency" from the DOJ confirms that Tri-Union has *admitted* to a criminal antitrust violation arising out of its pricing of canned tuna and likely means that the DOJ has conducted interviews with high-level Thai Union and/or Tri-Union executives involved in the conspiracy who also have admitted to the conspiracy and have provided information and evidence about it. And because only the first member of conspiracy to come forward is entitled to conditional leniency, Thai Union's announcement indicates that Tri-Union was the initial whistleblower regarding the conspiracy.

## DEFENDANTS' ILLEGAL CONSPIRACY

121.   During the Relevant Period, Defendants and their co-conspirators agreed to fix, raise, and maintain the prices of shelf-stable tuna sold to Plaintiff and others in the United States. This is reflected in the fact that the price of shelf-stable tuna has increased or was stable in the face of market forces – increasing supply and decreasing demand – putting downward pressure on such prices.  The anti-competitive conduct also is reflected in the criminal guilty pleas of

three executives and Bumble Bee itself, as well as Tri-Union's admission of guilt as part of the DOJ's Leniency Program.

122.    Upon information and belief, Defendants and their co-conspirators carried out their conspiracy to fix the prices of their canned tuna products through in-person meetings and communications including, but not limited to, phone calls and emails.  Through these meetings and communications, Defendants agreed on the terms of their conspiracy, including pricing and product information.  Defendants agreed on the timing and amount of price increases to Plaintiff and others in the United States.  On multiple occasions, Defendants raised the prices at which they sold shelf-stable tuna products to Plaintiff at around the same time, in roughly comparable amounts.

123.    Defendants' control of the shelf-stable tuna market provided them with numerous opportunities to meet and discuss the market and product pricing.  For example, upon information and belief, Defendants regularly attended the biannual "Infofish World Tuna Trade Conference," which was typically held in Bangkok, Thailand (and never in the United States).

124.    Defendants also met regularly at the National Fisheries Institute's ("NFI") Tuna Council, and the International Seafood Sustainability Foundation ("ISSF").

125.    The Tuna Council is a trade association within the NFI that met multiple times per year during the Relevant Period.  Upon information and belief, StarKist, Tri-Union, and Bumble Bee are the only members of the Tuna Council.  During the Relevant Period, and in furtherance of the conspiracy, Defendants met and communicated at Tuna Council meetings regarding the pricing of shelf-stable tuna products.  Upon information and belief, Defendants also exchanged confidential information regarding pricing, production, and customers of shelf-stable tuna.

126.    For example, in or around 2011, upon information and belief, Jan Tharp, then Bumble Bee's Sr. Vice President of Operations, attended a meeting at a hotel with executives from StarKist and Tri-Union.  During the meeting, the executives agreed that all three companies would raise prices on shelf-stable tuna products.  Tharp previously had served as an executive with StarKist. In March 2011, and effective May 2011, at least Bumble Bee and StarKist announced a price increase.

127.    In addition, in late 2011 and early 2012, there were communications among senior executives and sales personnel of Bumble Bee, Tri-Union, and StarKist that resulted in an agreement to raise list prices across their lines of canned tuna products.  Pursuant to this agreement, Defendants each raised the price at which they sold shelf-stable tuna products in a coordinated fashion.  Upon information and belief, during at least one telephone conversation between Bumble Bee and StarKist executives, StarKist informed Bumble Bee that StarKist and Tri-Union agreed to raise prices.

128.    Pursuant to the agreement, StarKist announced a list price increase in January 2012, effective March 2012.  Bumble Bee announced a virtually identical list price increase in January 2012, effective April 2012.  And Tri-Union announced a virtually identical list price increase in January 2012, effective April 2012.

129.    During the Relevant Period, Plaintiff purchased a variety of canned tuna products from Defendants, including canned tuna and pouched tuna.  On other occasions during the Relevant Period, Defendants raised prices of comparable products by comparable amounts at or about the same time.  These price increases were the direct result of Defendants' unlawful price-fixing conspiracy.

130.    Plaintiff's purchase data reveals other coordinated action by Defendants. For example, each Defendant sells cans of chunk light tuna in water and chunk light tuna in oil to Plaintiff in packs of 48.  Before 2008, the can size for chunk light tuna was 6 ounces for each Defendant. But in the middle of 2008, each Defendant, in quick succession, lowered the can size for chunk light tuna in water and chunk light tuna in oil to 5 ounces, while at the same time imposing virtually identical price increases.  Specifically:

(a)    No later than late July 2008, StarKist reduced the can size of its chunk light tuna to 5 ounces, while raising the price of a 48-pack by about $4;

(b)    No later than late August 2008, Tri-Union reduced the can size of its chunk light tuna to 5 ounces, while raising the price of a 48-pack of by about $4; and

(c)    No later than early September 2008, Bumble Bee reduced the can size of its chunk light tuna to 5 ounces, while raising the price of a 48-pack by about $4.

131.    Defendants reduced the sizes of cans of their chunk white tuna in water in coordinated fashion as well.  Specifically, StarKist and Bumble Bee reduced its cans of chunk white tuna from six to five ounces in 2008, and Tri-Union followed suit in early 2009. Once again, each reduction in can size was accompanied by a price increase.

132.    Defendants have been shrinking the package sizes of their shelf-stable tuna products for years.  The standard can of tuna came in seven-ounce cans prior to 2000, and then was quietly decreased to 6.5-ounce cans, then 6 1/8 ounces, and currently 5 ounces.  In each case, upon information and belief, the reduction is package sizes were not accompanied by price reductions.

133.   Plaintiff has been forced to accept Defendants' reduction in package size and corresponding price increases due to the Defendants' market share and market power in the canned tuna market.

134.   Other purchasers of canned tuna have noticed Defendants' coordinated can-size reductions and price increases.  In a 2010 article in the Daily Beast, Robert Ivers, vice president of Fairway Market, which annually sells more than 400,000 cans of tuna in the New York City area, noted that all canned tuna producers "raised their prices over the last 18 months." According to Ivers:  "They dropped the size and they raised the prices, and some of that increase we had to pass along, but not all, because we've decided to make smaller margins of profit." The time frame of the can size reductions and price increases experienced by Fairway Market correspond with those experienced by Plaintiff.

135.   In a functioning, competitive market experiencing decreasing demand and decreasing input costs, an individual Defendant would not have been able to impose can size reductions and price increases because doing so would have caused significant loss of market share.  Only by coordinating their efforts through their illegal conspiracy were Defendants able to foist these changes on Plaintiff.

136.   As another example of Defendants' collusion, in 2011 and 2012, StarKist, Tri-Union, and Bumble Bee jointly sponsored the advertising campaign "Tuna the Wonderfish" with the goal of increasing demand for shelf-stable tuna products.  Joe Tuza, Senior VP of Marketing for StarKist, reportedly remarked that the Tuna Council members "worked together surprisingly well."   He said that the campaign's effort to increase tuna supply would benefit all three members of the Tuna Council, for "as the water level rises . . . all boats rise with the tide."  Thus,

Defendants were amicably coordinating their advertising activities at the same time that they were agreeing to charge supra-competitive pricing.

137.    Although producers of agricultural commodity products sometimes collaborate on marketing campaigns, collaboration by competitors on their competing branded products are unusual.

138.    Upon information and belief, Defendants and their co-conspirators also agreed during the Relevant Period to refrain from engaging in aggressive promotion.  If one company were to aggressively promote a particular product, such promotion could undermine the Defendants' agreement to fix the price of such product.  Specifically, in 2012 and 2013, one or more Defendant complained to another Defendant regarding the latter's promotional activity, and the latter Defendant thereafter agreed not to engage in aggressive promotion.  This coordinated conduct furthered the conspiracy and its aims, and helped to maintain the artificially-inflated prices at which Defendants sold shelf-stable tuna products to Plaintiff.

139.    Another aspect of the conspiracy alleged herein was an agreement among Defendants to continue to use methods of fishing opposed by environmental groups such as Greenpeace.  Specifically, Defendants resisted outside pressure from environmental groups to discontinue or curtail the use of fish aggregating devices, or "FADs."  FADs are widely criticized because of the large number of by-catch animals ensnared inadvertently by the devices. These devices catch a high rate of endangered species of sharks, sea turtles, and other non-targeted fish species that become waste.  Defendants agreed among themselves, in furtherance of their unlawful conspiracy, not to switch to sustainably sourced, non-FAD methods.

140.    Executives of Defendants were concerned that, by switching to more sustainable methods of fishing, there would be a reduction in supply that would put pressure on their price

margins. Accordingly, upon information and belief, in 2011, executives from Bumble Bee, Tri-Union, and StarKist began to discuss an agreement not to sell any branded "FAD-free" packaged tuna.  In 2012, upon information and belief, Defendants reached such an agreement.  The result of the agreement was the absence of FAD-free shelf-stable tuna products from Defendants during the Relevant Period.

141.    Thus, Defendants' unlawful agreement was about more than fixing and maintaining a price on shelf-stable tuna products.  In addition, Defendants agreed to curtail aggressive promotional activity, to refrain from selling FAD-free products, and to take other steps, all for the purpose of generating profits through their unlawful agreement.  Among the other steps taken by Defendants were agreements (a) to reduce package sizes, (b) to limit promotions and discounts on packaged tuna, (c) to enter into co-packing agreements involving the shared use of packing and canning facilities, and (d) to not accept customer orders exceeding the customer's historical buying pattern.

142.    Based on the foregoing, Defendants charged Plaintiff and others supra-competitive prices for shelf-stable tuna products during the Relevant Period.  This conduct violated federal and state antitrust laws and caused Plaintiff to sustain damages, injury, and harm to its business in an amount to be determined.

## EFFECTS OF THE DEFENDANTS' ILLEGAL COURSE OF CONDUCT

143.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition among the Defendants in the sale of shelf-stable tuna was restrained and suppressed;

(b)    Prices of shelf-stable tuna manufactured and sold in the United States by the Defendants were fixed, raised, maintained and/or stabilized at supra-competitive levels; and

(c)    Direct purchasers of shelf-stable tuna, including Plaintiff, were deprived

of the benefits of free and open competition in the purchase of shelf-stable tuna.

144.    Defendants' contract, combination, and conspiracy described herein consists of a continuing agreement, understanding and concert of action among the Defendants, the substantial terms of which were to artificially fix, raise, maintain, and/or stabilize prices paid by Plaintiff and other purchasers for shelf-stable tuna in the United States.

145.    In formulating and effectuating the contract, combination, or conspiracy, Defendants in fact did those things that they unlawfully combined and conspired to do, including, among other things: agreeing to artificially fix, raise, maintain and/or stabilize prices for shelf-stable tuna in the United States, and implementing and monitoring the conspiracy among the cartel members.

146.    The activities described above have been engaged in by Defendants for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for shelf-stable tuna sold in the United States.

147.    As a direct and proximate result of the contract, combination, or conspiracy alleged herein, Plaintiff was, and continues to be, damaged in its business or property in that it paid supra-competitive prices for shelf-stable tuna, higher than that which it would have paid in the absence of the contract, combination, or conspiracy.

## TOLLING AND/OR PRESERVATION OF THE STATUTES OF LIMITATIONS AND FRAUDULENT CONCEALMENT

148.    The statutes of limitation as to Defendants' continuing antitrust violations were tolled and/or the causes of action were preserved by the pendency of the class action complaints filed against Defendants for conspiring to fix prices of shelf-stable tuna in violation of the Sherman Act and the Kansas Restraint of Trade Act. The first class action complaint that encompasses Plaintiff's claims was filed in 2015.

149.    The statutes of limitations as to Defendants' antitrust violations were also tolled and/or the causes of action were preserved by Defendants' fraudulent concealment as alleged below.

150.    During the Relevant Period, Plaintiff believed in good faith at the time that it was paying competitive prices for shelf-stable tuna purchased from Defendants.  Plaintiff did not know Defendants had entered into the conspiracy.

151.    Defendants' conspiracy was self-concealing, which prevented Plaintiff from discovering its existence.  Notwithstanding the self-concealing nature of their conspiracy, Defendants wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff by, without limitation, and upon information and belief, one or more of the following acts:

(a)    Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(b)    Confining the anticompetitive, unlawful plan to a limited number of people and key officials at each Defendant company;

(c)    Avoiding references in publicly-available documents to conduct which would constitute an antitrust violation or anticompetitive act; and

(d)    Conducting covert, secret conspiracy communications or meetings in the United States and elsewhere.

152.    Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence the existence of the claims sued upon because of the self-concealing character of the conspiracy and/or because of Defendants' fraudulent concealment of the conspiracy.

## CAUSES OF ACTION

### COUNT I
### Conspiracy to Fix Prices in Violation of the Sherman Act
### 15 U.S.C. § 1
### (Against All Defendants)

153.   Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

154.   Beginning at least as early as May 2004 and continuing through at least July 2015, Defendants engaged in a continuing agreement, understanding and conspiracy to manipulate the price of shelf-stable tuna in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

155.   Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Sherman Act.  Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

156.   The contract, combination, and conspiracy among Defendants consisted of a continuing course, pattern, and practice of conduct regarding the production, pricing, and sale of shelf-stable tuna,  the substantial terms and purpose of which were:

> (a)   To fix, stabilize, maintain and/or raise prices of shelf-stable tuna in the United States and elsewhere; and/or

> (b)   To control or reduce the output of shelf-stable tuna in the United States and elsewhere.

157.   In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants engaged in one or more of the following overt acts:

(a)     They agreed to exchange and did exchange current and future price information and private and proprietary business information about shelf-stable tuna sold in the United States and elsewhere;

(b)     They agreed to coordinate and did coordinate price levels and price movements of shelf-stable tuna sold in the United States and elsewhere;

(c)     They agreed on prices and price levels of shelf-stable tuna sold in the United States and elsewhere;

(d)     They agreed to control or reduce, and did control or reduce, the output of shelf-stable tuna in the United States and elsewhere; and

(e)     They agreed to limit and or reduce the marketing of their products, including by agreeing not to advertise their products as "FAD free."

158.    Defendants entered into and refined their illegal combination and conspiracy through, among other things, the overt acts described above, including without limitation, participating in conversations and meetings in the United States and/or elsewhere to discuss the prices of shelf-stable tuna to be sold and/or the volume of shelf-stable tuna to be produced in the United States and elsewhere; participating in conversations and attending meetings in the United States and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in accordance with the conspiracy; and/or exchanging information about the sale of shelf-stable tuna in the United States and elsewhere.

159.    As a result of Defendants' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. §, and during the Relevant Period:

(a)     Price competition in the sale of shelf-stable tuna among Defendants to Plaintiff and others has been restrained, suppressed and eliminated;

(b)     Prices for shelf-stable tuna sold by Defendants have been raised, fixed, maintained, and/or stabilized at artificially high and noncompetitive levels throughout the United States and elsewhere; and

(c)     Plaintiff has been deprived of the benefit of free and open competition.

160.    Plaintiff has been injured in its business or property by reason of Defendants' antitrust violations in amounts not yet determined.  Plaintiff's injuries as a direct purchaser of shelf-stable tuna are injuries of the type that the antitrust laws were designed to prevent and flow from that which makes Defendants' acts unlawful.

161.    Because Defendants controlled approximately 70-80% of the Relevant Market during the Relevant Period, their collective price increases provided sufficient cover, or a "price umbrella," for non-cartel companies who sold shelf-stable tuna without fear of losing sales or market share.

## COUNT II
### Violation of the Kansas Restraint of Trade Act
### K.S.A. 50-101 et seq.
### (Against All Defendants)

162.    Plaintiff incorporates by reference the allegations above, as if fully set forth herein.

163.    Beginning at least as early as May 2004 and continuing through at least July 2015, Defendants engaged in a continuing agreement, understanding, arrangement, contract, trust, combination and conspiracy to manipulate the price of shelf-stable tuna in the United States, in violation of the Kansas Restraint of Trade Act K.S.A. 50-101 *et seq.*

164.    Defendants each gave their assent to, and acted in furtherance of, activities prohibited by the Kansas Restraint of Trade Act.  Each Defendant is fully and jointly liable for all acts in furtherance of the conspiracy committed by each other co-conspirator, and by each co-conspirator's agents, employees, representatives, trade groups and other associates, whether named or unnamed in this Complaint.

165.    Defendants' actions in violation of the Kansas Restraint of Trade Act include, but are not limited to, participating in a collusive agreement to artificially raise and maintain pricing on shelf-stable tuna through the implementation of coordinated price increases and/or supply manipulation.

166.    Defendants affirmatively concealed from Plaintiff and the general public the existence of their illegal understandings and agreements through misrepresentations and omissions regarding this conspiracy.

167.    As a direct and proximate result of Defendants' conduct, Plaintiff directly purchased shelf-stable tuna at prices higher than it would have paid and on terms that are less favorable than would have been available in a competitive market.

168.    The anticompetitive effect of Defendants' illegal arrangements, contracts, agreements, combination, and conspiracy was to distort and/or artificially inflate the prices that Plaintiff paid for shelf-stable tuna.  Defendants' actions further restrained and controlled full and free competition in the market for shelf-stable tuna.

169.    Defendants' actions deprived Plaintiff of the right to make budgeting, accounting, resource allocations, and other financial and business decisions in a full and free competitive market for canned tuna.

170.     As a result of its purchases, Plaintiff thereby suffered loss, injury, and damage in an amount greater than $75,000.

171.     Plaintiff is entitled to recover in its capacity as a direct purchaser of canned tuna.

172.     Plaintiff seeks to recover treble the damages it sustained as a result of Defendants' conduct, as well as attorneys' fees, costs, and any additional remedies provided by law.

173.     There exists a significant threat of injury to Plaintiff because Defendants' anticompetitive actions continue through today and/or are likely to reoccur.

174.     Under K.S.A. 50-161, Plaintiff therefore seeks to have Defendants enjoined from directly or indirectly continuing the conspiracy and/or the agreement to artificially manipulate and inflate the price of shelf-stable tuna.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests a judgment:

1.     Declaring that the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants, were in violation of Sections 1 of the Sherman Act, 15 U.S.C. § 1 and the Kansas Restraint of Trade Act, K.S.A. 50-101, et seq.;

2.     Finding against Defendants, jointly and severally, in treble the amount of Plaintiff's damages;

3.     Awarding to Plaintiff its attorneys' fees, costs, and interest as allowable by law; and

4.     Entering a permanent injunction prohibiting Defendants from future violations of the antitrust laws and from practices that facilitate those violations.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury of all issues triable by jury.

## <u>DESIGNATION OF PLACE OF TRIAL</u>

Plaintiff hereby designates Kansas City, Kansas as the place of trial.

Respectfully submitted,

**STUEVE SIEGEL HANSON LLP**

/s/ Patrick J. Stueve
Patrick J. Stueve — KS Bar # 13847
stueve@stuevesiegel.com
Steve N. Six—KS Bar # 16151
six@stuevesiegel.com
C. Curtis Shank—KS Bar # 26306
shank@stuevesiegel.com
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone:  816-714-7100
Facsimile:  816-714-7101

**COUNSEL FOR PLAINTIFF
ASSOCIATED WHOLESALE GROCERS, INC.**